UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CHARLES CHAMAR LUMPKIN,                    :
     Plaintiff,                                      :
                                                         :
v.                                                              :               No. 3:12cv1817 (DJS)
                                                         :
CAROLYN W. COLVIN,                              :
ACTING COMMISSIONER                        :
OF SOCIAL SECURITY,                            :
     Defendant.                                    :

MEMORANDUM OF DECISION

The plaintiff, Charles Chamar Lumpkin ("the plaintiff" or "Lumpkin"), filed this action

under § 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), seeking review of a

final decision by the Commissioner of Social Security ("the defendant" or "the Commissioner")

denying the plaintiff's applications under Title II of the Social Security Act for Social Security

Disability benefits ("SSD") and under Title XVI of the Social Security Act for Supplemental

Security Income ("SSI").[1] Pending before the Court are the plaintiff's motion for judgment on the

pleadings and the defendant's motion to affirm the Commissioner's decision. For the reasons

stated below, the plaintiff's motion for judgment on the pleadings (doc. # 13 ) is granted in part

and denied in part,  and the defendant's motion to affirm the Commissioner's decision (doc. # 17)

is denied.

I.  PROCEDURAL HISTORY

The plaintiff Lumpkin filed concurrent applications for SSD and SSI on September 29,

2009, alleging disability since January 1, 2009. His claims were initially denied on November 3,

---

[1] With the exception of determining whether the insured status requirements were met for
purposes of Title II of the Social Security Act, which is not in dispute in this case, the applicable
standards and analysis are the same as to both of the plaintiff's applications.

2009, and upon reconsideration on October 7, 2010. Lumpkin subsequently reqested a hearing, which was held before an Administrative Law Judge ("ALJ") on October 18, 2011. The plaintiff, represented by counsel, appeared and testified at the hearing. In a decision dated October 28, 2011, the ALJ found Lumpkin not disabled within the meaning of the Act. Acting through counsel, the plaintiff thereafter requested a review of the ALJ's decision. On November 1, 2012, the Appeals Council denied Lumpkin's request for review. Accordingly, the ALJ's decision became the final decision of the Commissioner.

## II.  STANDARD OF REVIEW

In reviewing the Commissioner's decision, this Court must "determine if the correct legal standards have been applied and if the decision is supported by substantial evidence." *Bushey v. Colvin*, 552 F. App'x 97 (2d Cir. 2014). "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Prince v. Astrue*, 514 F. App'x 18, 20 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The Court must carefully review the entire administrative record to determine the reasonableness of the ALJ's factual findings. *See Plouffe v. Astrue*, No. 3:10 CV 1548 (CSH), 2011 WL 6010250, at *14 (D. Conn.  Aug. 4, 2011). The Commissioner's findings are conclusive if supported by substantial evidence, regardless of whether the reviewing court might have found otherwise. *Id.*

In reviewing the Commissioner's decision, the Court notes that "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have [his] disability determination made according

to the correct legal principles." *Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998) (internal quotation marks omitted). While credibility determinations are within the exclusive province of the ALJ, a finding that a witness is not credible must be "set forth with sufficient specificity to permit intelligible plenary review of the record." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 261 (2d Cir. 1988). Additionally, with regard to any finding that is potentially dispositive on the issue of disability, the ALJ's decision must include a discussion that is sufficient "to enable a reviewing court to determine whether substantial evidence exists to support that finding." *Schupp v. Barnhart*, Civ. No. 3:02CV103 (WWE), 2004 U.S. Dist. LEXIS 14071, at *6 (D. Conn. March 12, 2004).

## III.  FACTUAL BACKGROUND

Lumpkin was born in 1970 and was 38 years old on the initial alleged disability onset date[2]. He had one year of college education and his past relevant work was as an iron worker, a job that involved a considerable amount of climbing, lifting, and balancing.

Medical History

Beginning in early 2008 and continuing until April 2009 Lumpkin had a series of hospitalizations and underwent multiple surgical procedures relating to his esophagus. While his diagnoses upon discharge varied over this period of time, the predominant diagnoses were tracheoesophageal fistula[3] ("TEF") and HIV infection. Risks associated with surgery to repair a

---

[2]Lumpkin's applications for benefits alleged disability beginning on January 1, 2009. At the time of the hearing before the ALJ, his attorney stated that Lumpkin "last worked sometime in 2010, so we're amending the onset to January 1st of 2011." (Doc. # 18-2, at 32).

[3]"A fistula is an abnormal connection between an organ, vessel, or intestine and another structure." http://www.nlm.nih.gov/medlineplus/ency/article/002365.htm. Thus, a tracheoesophageal fistula is an abnormal connection between the trachea and the esophagus.

TEF include "collapsed lung" and "re-opening of the fistula."[4]

1.  Fielding Johnson, M.D. - Treating Pulmonologist

Dr. Fielding Johnson, a specialist in pulmonary medicine, began treating Lumpkin in 2007 and continued to treat him throughout the time period relevant to this action. In a Multiple Impairment Questionnaire ("the Questionnaire") dated August 14, 2011, Dr. Johnson indicated that he treated Lumpkin on a monthly basis. (Doc. # 18-12, at 2). Dr. Johnson's diagnosis of Lumpkin in the Questionnaire was tracheoesophageal fistula status post-surgical repair with chronic non-cardiac chest pain. (*Id.*). The doctor identified right chest wall swelling, chronic narcotic use, and recurrent lower back infections as clinical findings that support his diagnosis. (*Id.*). He further identified a 2008 CT scan and a 2011 upper GI series as the laboratory and diagnostic test results which support his diagnosis. (*Id.* at 3). The prognosis listed for Lumpkin's condition was "fair." (*Id.* at 2). Dr. Johnson indicated that Lumpkin had moderately severe chest wall pain on a daily basis. (*Id.* at 3-4).

The Questionnaire completed by Dr. Johnson included a "residual functional capacity" section. In that section, Dr. Johnson indicated the following: Lumpkin could sit for only four hours in an eight-hour day and could stand/walk for only one hour; he could not sit continuously in a work setting, but would have to get up hourly and move around for 15 minutes; he could lift up to five pounds frequently, up to ten pounds occasionally, but never more than ten pounds; he could occasionally carry up to ten pounds, but never more than ten pounds. (*Id*. at 4-5).

Dr. Johnson indicated that Lumpkin would have significant limitations in doing repetitive reaching, handling, fingering or lifting, because his chest pain would worsen with increased

---

[4]http://www.nlm.nih.gov/medlineplus/ency/article/002934.htm

breathing or repetitive activity. (*Id*. at 5).The degree of limitation noted by Dr. Johnson for use of the upper extremities  was moderate for grasping on the right side, moderate for reaching with the left arm, and marked (essentially precluded) for reaching with the right arm. (*Id*.).

Dr. Johnson noted that Lumpkin could tolerate only low stress in a work environment. In support of that conclusion, the doctor stated that Lumpkin was able to work until the time of his surgeries, but that his "attempted return" to work was not successful. (*Id*. at 7). Dr. Johnson listed psychological limitations and the need to avoid fumes, gases, temperature extremes, dust, bending, and stooping as other limitations that would affect Lumpkin's ability to work at a regular job on a sustained basis. (*Id*. at 8). In Dr. Johnson's "best medical opinion" the earliest date that his description of symptoms and limitations applied to Lumpkin is 2009. (*Id.*).

In a narrative report also dated August 14, 2011, Dr. Johnson stated as follows:

> In terms of patient's issues, there are two major issues to his work impairment. He is HIV positive and is on a strict regimen of medications requiring time and dosage throughout the day. . . . The more concerning issue with Mr. Lumpkin is his esophageal tracheal fistula. He has had this ongoing for several years. . . . He is now stable postop without recurrent infections, but is on chronic pain medications because of the pain from surgery. . . . Between the chronic pain medications and his HART therapy for his HIV positive status, he is, in my opinion, unable to sustain any gainful employment and this status is indefinite.

(Doc. # 18-11, at 112-13).

2.  Christopher Morse, M.D. - Treating Physician

Dr. Christopher Morse treated Lumpkin for his TEF between March 1, 2008, and October 27, 2009. On September 28, 2011, Dr. Morse issued a narrative report in which he stated as follows:

> Mr. Lumpkin underwent multiple attempts to fix this problem
> [TEF] with esophageal stents and finally underwent surgical
> repair. Mr. Lumpkin's condition has caused loss of appetite,
> weight loss, malnutrition and multiple instances of aspiration
> pneumonia. Unfortunately, my prognosis for Mr. Lumpkin's
> condition is guarded. . . . Mr. Lumpkin would only be able to
> sit and stand/walk for a total of three hours each in a typical
> workday and would only be able to occasionally lift and carry
> up to 10 pounds. Mr. Lumpkin's condition is further affected
> by his status HIV positive. As would be expected, this causes
> severe stress. Mr. Lumpkin's condition would likely cause
> Mr. Lumpkin to be absent from work more than three times
> per month. From my assessment while I was treating Mr.
> Lumpkin, I do not believe he was capable of maintaining any
> sort of gainful employment at the time.

(Doc. # 18-11, at 115). In 2010 Dr. Morse had completed a "Gastrointestinal Disorders

Impairment Questionnaire" which indicated that Lumpkin could sit and stand/walk for a total of

three hours each in an eight hour day, could occasionally lift or carry no more than ten pounds,

and would likely be absent from work more than three times a month as a result of his

impairment. (Doc. # 18-11, at 76-77).

3.  James B. Ryan, D.O. - Consulting Physician

Dr. James Ryan performed a consultative examination of Lumpkin on September 23,

2010, at the request of a Social Security Administration disability examiner. Dr. Ryan's report

indicates that "[t]he patient is the historian for this exam and the quality of the history is fair to

good." (Doc. # 18-11, at 69). Under the heading "impression," Dr. Ryan noted as follows:

> Pain is very problematic for the patient and it wakes him at
> night. He at times uses OxyContin but that is not always helpful.
> Today's exam, the patient was having a good day, and only had
> mild discomfort and was able to achieve full utilization of
> the right arm even though he was having pain. The patient did have
> difficulty taking full breaths for auscultation. He states that

since the surgery he finds it difficult to take deep breaths, also
he becomes short of breath with exertion. The patient also has
history of HIV.

(*Id.* at 71). The report also stated that:

> The patient is capable of sitting. The patient is capable of
> standing. The patient was unable to refer as to how long
> he can stand without discomfort and he states he is always
> in discomfort and he does not stand very often. The patient is
> capable of walking. He states he can walk for about 5
> minutes as long as he walks slowly and it is a leveled
> surface. He has trouble with stairs. He does become short
> of breath easily since the surgery. Lifting, the patient avoids
> lifting and he says he has to be very careful about [sic] he lifts
> because of the discomfort he has on the right side since the
> harvesting of the latissimus muscle for his surgery. The
> patient can grasp and manipulate objects without difficulty.
> Carrying objects would be somewhat problematic for the
> patient due to pain in his right side and also his shortness
> of breath with exertion.

(*Id.* at 72).

4.  Firooz Golkar, M.D. - Consulting Physician

    Dr. Firooz Golkar  issued an opinion on or about November 2, 2009, in which he

concluded that Lumpkin was not disabled for purposes of the Social Security Act. According to

the ALJ, Dr. Golkar, who was characterized as a "[s]tate agency medical consultant," based his

opinion "on a review of the record." (Doc. # 18-2, at 22).  Dr. Golkar's Disability Determination

Explanation identifies the "evidence of record" as  medical records from Massachusetts General

Hospital and St. Francis Hospital and Medical Center - Mt. Sinai. (Doc. # 18-3, at 5). The report

also states that additional evidence had been requested from Hartford Hospital. Under the

heading "weighing of opinion evidence," the report states, "There is no indication of medical or

other opinion evidence in file." (*Id.* at 7). There is no mention of either Dr. Johnson or Dr. Morse

in Dr. Golkar's report.

Dr. Golkar listed "HIV" as Lumpkin's primary impairment diagnosis and "Diseases of Esophagus" as his secondary impairment diagnosis. (*Id.*). As to both diagnoses, Dr. Golkar indicated "Yes" under the heading "Severity." (*Id.*) Under the heading "symptoms and credibility," Dr. Golkar's report states that Lumpkin's medically determinable impairments could reasonably be expected to produce his pain or other symptoms, and that Lumpkin's statements about the intensity, persistence, and functionally limiting effects of the symptoms were substantiated by the objective medical evidence alone. (*Id.*).

Dr. Golkar's report included a residual functional capacity section. The doctor stated that Lumpkin had certain exertional limitations. According to Dr. Golkar, Lumpkin could: occasionally, i.e., 1/3 or less of an 8 hour day, lift and/or carry 20 pounds; frequently, i.e., more than 1/3 up to 2/3 of an 8 hour day, lift and/or carry 10 pounds; stand and/or walk for a total of about 6 hours in an 8 hour day; and sit for a total of about 6 hours in an 8 hour day. (*Id.* at 8). At the end of the exertional limitations section of the report form, Dr. Golkar was asked to "Explain exertional limitations indicated above." (*Id.*) His response was "Projected exertional limitation following recent repair of TE fistula by 9-2010." (*Id.*).

Dr. Golkar also stated that Lumpkin had postural limitations. His report indicates that Lumpkin could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl, but could never climb ladders. (*Id.*). This doctor further indicated that Lumpkin had certain environmental limitations, which were avoiding concentrated exposure to extreme cold or heat, and avoiding even moderate exposure to hazards, e.g., machinery, heights. (*Id.* at 9).

After noting that Lumpkin did not have the residual functional capacity to perform his

-8-

past relevant work, i.e., iron worker, Dr. Golkar concluded that he demonstrated the maximum

sustained work capability for "light" work. (*Id.* at 10). Dr. Golkar's report concluded with a

"personalized decision notice" in which he stated the following:

> The evidence indicates your condition(s) is severe and prevents
> you from working at this time. Although you are unable to work
> at this time and will not be able to return to any of your past
> work, it is concluded that within 12 months from the onset of
> your condition(s) you should be able to perform other jobs which
> are less demanding. Therefore, you do not meet the requirements
> for disability benefits. In deciding this, we considered the medical
> evidence, your statements, and how your condition(s) affects
> your ability to work.

(*Id.* at 11).

5.  Virginia H. Ritter, M.D. - Consulting Physician

Dr. Virginia Ritter completed a Disability Determination concerning Lumpkin on October

6, 2010. Dr. Ritter conducted a record review in the same manner as had been done by Dr.

Golkar. Dr. Ritter's Disability Determination Explanation indicates that she reviewed medical

records from St. Francis Hospital and Medical Center - Mt. Sinai, Massachusetts General

Hospital, and Hartford Hospital. With regard to Dr. Johnson, Dr. Ritter indicated that "records

were not attainable from PCP [primary care physician] due to office issues with their medical

recor[d]s system."[5] (Doc. # 18-3, at 25). With regard to the consultative examination performed

by Dr. Ryan, Dr. Ritter briefly notes that Lumpkin was "alert, cooperative, oriented x 3, gait

[normal], . . . mildly decreased muscle tone noted in the R side in the area of harvesting

---

[5]An August 6, 2010 letter from Dr. Johnson's Office Manager states that "this practice
had a computer problem in June of this year making our entire patient electronic medical record
system database as well as the backup corrupted. We had hoped the problem would be corrected
prior to this time but that is not what has happened." (Doc. # 18-11, at 66).

latissimus muscle for the surgery, . . . slight atrophy of the latissimus region of R side, no

tremor[.]" (*Id.*).

Dr. Ritter's residual functional capacity assessment was, for the most part, identical to that

of Dr. Golkar. One notable difference is her response that Lumpkin did not have any

environmental limitations. (*Id.* at 27). Dr. Ritter likewise  concluded that Lumpkin demonstrated

the maximum sustained work capability for light work. Dr. Ritter's personalized decision notice

stated the following:

> Your condition results in some limitations in your ability to
> perform work related activities. While you are not capable of
> performing work you have done in the past, you are able to
> perform work that is less demanding. We have determined
> that your condition is not severe enough to keep you from
> working. We considered the medical and other information,
> your age, education, training, and work experience in
> determining how your condition affects your ability to work.

(*Id.* at 29).

Plaintiff's Testimony

Lumpkin appeared and testified at the October 18, 2011 hearing. When asked about his

work history since the time of his surgery in 2008, he stated that he had a number of temporary

jobs working as an iron worker from that time until December 2010, but that he was unable to

successfully complete these jobs:

> I mean I had to work. . . . I was dying while I was doing it.
> It's like having a heart attack every step you take, because
> of a lot of ladder climbing. I'm an iron worker, so you
> can't - - up and down a ladder, up and down steps and
> carrying stuff. . . .
> Some of them were like a two-day job just as long as they - -
> I could hide the fact that I couldn't do everything. Maybe a
> two-day job. Sometimes it was four weeks, for as long as

-10-

> somebody could carry me until, until they see that I'm not
> doing what I'm supposed to be able to do.
> . . . .
>
> They let me go before the jobs ended, because I couldn't cut
> the mustard. I couldn't do - - once the big guys could see that
> I wasn't holding up my share of work, that was it. Like I said,
> one of those jobs only lasted two days and I was - - they let
> me go.

(Doc. # 18-2, at 34-35, 37).

In response to questions posed by the ALJ, Lumpkin testified that he had earned

$42,000.00 in 2009 as a result of an iron worker job with Burlington Steel that lasted for

approximately six months. He testified further that in 2010 he had a temporary iron worker job

with Bear Steel that lasted for six weeks and another temporary position with Southern New

England Builders. The ALJ characterized these as "two significant jobs." (*Id.* at 43).


## IV.  DISCUSSION

In order to receive disability benefits under the Social Security Act, an individual must be

under a "disability," i.e., an "inability to engage in any substantial gainful activity by reason of

any medically determinable physical or mental impairment which . . . has lasted or can be

expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

Such an impairment must be "of such severity that [the applicant] is not only unable to do his

previous work but cannot, considering his age, education, and work experience, engage in any

other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. §

423(d)(2)(A).

The Commissioner must apply a five-step analysis in evaluating disability claims. *See* 20

C.F.R. § 404.1520:

-11-

> In essence, if the Commissioner determines (1) that the claimant is
> not working, (2) that he has a 'severe impairment,' (3) that the
> impairment is not one that conclusively requires a determination of
> disability, and (4) that the claimant is not capable of continuing in
> his prior type of work, the Commissioner must find him disabled
> if (5) there is not another type of work the claimant can do. Although
> the claimant bears the general burden of proving that he is disabled
> under the statute, if the claimant shows that his impairment renders
> him unable to perform his past work, the burden then shifts to the
> [Commissioner] to show there is other gainful work in the national
> economy which the claimant could perform.

*Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002) (internal quotation marks and citations

omitted).

The issues before this Court relate solely to step five of this process. The ALJ found that

Lumpkin is not working, has a severe impairment that does not conclusively require a

determination of disability, and is not capable of continuing in his prior type of work. Neither

party has contested any of these findings. What is in dispute is the ALJ's assessment of

Lumpkin's residual functional capacity for the purpose of determining whether he is capable of

performing other gainful work. Residual functional capacity ("RFC") "is the most [the claimant]

can still do despite [his] limitations." 20 C.F.R. § 404.1545 (a)(1). The ALJ must assess a

claimant's RFC "based on all of the relevant medical and other evidence." 20 C.F.R. §

404.1545(a)(3).

## A. The Treating Physician Rule

The plaintiff's first argument is that the ALJ failed to follow the "treating physician rule."

The "treating physician rule" provides that "[t]he opinion of a treating physician on the nature or

severity of a claimant's impairments is binding if it is supported by medical evidence and not

contradicted by substantial evidence in the record." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir.

2013). "In order to override the opinion of the treating physician . . . the ALJ must explicitly consider . . . (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Id.*

The ALJ noted in his decision that Dr. Johnson had treated Lumpkin since 2007 and that Dr. Morse was also a treating physician. The ALJ went on to state that, "The undersigned has given some weight to Drs. Morse and Johnson's assessments of the claimant's condition as severe based on their treatment and description of procedures. However, the undersigned has given no weight to their assessments of the claimant's physical limitations." (Doc. # 18-2, at 21-22). With regard to the opinion of Dr. Golkar that Lumpkin "could perform less than the full range of light work with postural limitations," the ALJ stated that, "The undersigned affords this opinion considerable weight, as it is based on a review of the record and is mostly consistent with the objective findings. Nevertheless, the medical evidence of record does not support additional postural limitations." (*Id.* at 22).  The ALJ's decision makes no mention of Dr. Ritter or her October 6, 2010 Disability Determination.[6]

In connection with his statement that he had given no weight to Dr. Morse's assessment of Lumpkin's physical limitations, the ALJ noted that "Dr. Morse last treated the claimant in October 2009 . . . ." (*Id.*). At the same time, however, the ALJ afforded considerable weight to the opinion of Dr. Golkar, who had signed his RFC assessment on "10/27/2009," which

---

[6]The Court declines the defendant's invitation to conclude "that the ALJ considered Dr. Ritter's opinion and gave it substantial weight." (Doc. # 17-1, at 5 n. 3). *See Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999) (internal quotation marks omitted) ("A reviewing court may not accept appellate counsel's *post hoc* rationalizations for agency action.").

coincidentally was the exact same date on which Dr. Morse last saw Lumpkin: "I last saw Mr. Lumpkin on October 27, 2009." (Doc. # 18-11, at 115). Additionally, while Dr. Morse completed his impairment questionnaire in October 2010, nothing in the ALJ's decision suggests any significant change from 2009 to 2010 in the intensity, persistence, or limiting effects of Lumpkin's symptoms. The decision notes "stable chronic findings" with regard to testing done in January 2011. (Doc. # 18-2, at 22). The decision further indicates that "[w]hile there may have been a short period of time after surgery in which the claimant could not have functioned, there is nothing in the medical evidence of record to suggest that the claimant's condition worsened after recovering from surgery. He had significant earnings in 2009 and 2010 . . . ." (Doc. # 18-2, at 22).

   With regard to both Dr. Johnson and Dr. Morse, the ALJ stated that "there is no indication that either doctor was aware of, or took into account, the claimant's work activity throughout this period." (*Id.*). The work activity referred to by the ALJ was Lumpkin's intermittent work as an iron worker in 2009 and 2010. The Court notes that Dr. Johnson's Multiple Impairment Questionnaire, dated August 14, 2011, states that Lumpkin "was able to work until recent surgery; attempted return [not][7] successful." (Doc. # 18-12, at 7, no. 23). While Dr. Johnson's report does not contain any more details about Lumpkin's attempted return to work after his surgery, that notation could indicate that Dr. Johnson was aware of, and took into account, Lumpkin's post-surgery work activity. To the extent there is a lack of clarity on this point, "the ALJ generally has an affirmative obligation to develop the administrative record. This

---

   [7]The doctor's report contains the "no" symbol, i.e., a circle with a diagonal line through it, followed by the word "successful." The Court construes this as "not successful."

duty exists even when the claimant is represented by counsel . . . ." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citation omitted).

The Commissioner is required by regulation to "always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." 20 C.F.R. § 404.1527 (c)(2).  In this instance the Court finds that while the ALJ did articulate reasons for not crediting the opinions of Lumpkin's treating physicians, these were not "good reasons" as is required. *See Martinez v. Colvin*, No. 12-CV-05713 (LGS) (RLE), 2014 U.S. Dist. LEXIS 89096, at *28 (S.D.N.Y. June 27, 2014) ("Reasons that are conclusory fail the 'good reasons' requirement."). "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

Additionally, the plaintiff contends that the ALJ 's decision should be reversed because it fails to explicitly address the factors identified in *Selian v. Astrue*, 708 F.3d 409 (2d Cir. 2013), i.e., "(1) the frequency, length, nature, and extend of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Id* at 418.   In *Selian*, the Second Circuit stated that "[i]n order to override the opinion of the treating physician . . . the ALJ must explicitly consider" the four listed factors. *Id.* The defendant argues in turn that the ALJ need not explicitly address each *Selian* factor in his decision, but that "it is sufficient when a court can discern from context that an ALJ has applied the substance of the treating physician rule . . . ." (Doc. # 17-1, at 11).  Without holding that the ALJ must explicitly address each of the *Selian* factors in his decision, the Court finds that it is not "clear from the decision that the proper analysis was undertaken." *Khan v. Astrue*, No. 11-CV-5118 (MKB), 2013 U.S. Dist. LEXIS 106950, at *45-

-15-

46 (E.D.N.Y. July 30, 2013). There is no indication in the ALJ's decision that the factors

identified in *Selian* were explicitly considered. The ALJ's discussion of Lumpkin's functional

limitations focuses more on Lumpkin's credibility than on the opinions of his treating physicians.

Since the Court cannot conclude that the proper analysis was undertaken pursuant to *Selian*, that

too is a sufficient reason to remand the Commissioner's decision.

    In contrast to the treatment of the opinions of Drs. Johnson and Morse, the ALJ afforded

"considerable weight" to the opinion of Dr. Golkar. (Doc. # 18-2, at 22). Dr. Golkar was a

consulting, not a treating, physician with regard to Lumpkin. Dr. Golkar never examined

Lumpkin, but instead based his opinion on a review of records from two hospitals which had

provided services to Lumpkin. The ALJ's  reliance on Dr. Golkar's opinion "contravened the

clear guidance of [Social Security Administration] regulations, as Dr. [Golkar] was a

nonexamining source whose opinions are to be accorded less weight than those of examining

sources and especially treating sources." *Brown v. Commissioner of Social Security*, No. 06-CV-

3174 (ENV) (MDG), 2011 U.S. Dist. LEXIS 28046, at *14 (E.D.N.Y. March 18, 2011). The

Court notes that the exertional limitations indicated in Dr. Golkar's RFC assessment were

characterized by the doctor as "*[p]rojected* exertional limitations following recent repair of TE

fistula by 9-2010."[8]  (Doc. # 18-3, at 8) (emphasis added).  Dr. Golkar also stated in his

personalized decision notice to Lumpkin that "[t]he evidence indicates your condition(s) is severe

and prevents you from working at this time." (*Id*. at 11). Thus Dr. Golkar's opinion, which was

provided in late 2009, and which the ALJ afforded great weight, would seem to be inconsistent

---

    [8]Dr. Golkar's report specifies that his physical RFC assessment is for the period
"09/29/2009 - 09/29/2010." (Doc. # 18-3, at 8).

with the ALJ's statement that Lumpkin was able to engage in substantial gainful activity throughout 2009 and 2010: "[T]he claimant was able to work at a job for considerable periods of time [in 2009 and 2010] at a heavy exertional level at the level of substantial gainful activity." (Doc. # 18-2, at 21).

The ALJ's decision also notes the findings of the consultative examination performed by Dr. Ryan. Although the ALJ does not explicitly state that he accorded any particular weight to Dr. Ryan's findings, those findings were mentioned in the section of the decision in which the ALJ concluded that Lumpkin has the RFC to perform the full range of light work. In this regard, the Second Circuit has "cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination." *Selian*, 708 F.3d at 419. This is so because "consultative exams are often brief, are generally performed without the benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day." *Tankisi v. Commissioner of Social Security*, 521 F. App'x 29, 34 (2d Cir. 2013) (internal quotation marks omitted).  These concerns are applicable to Dr. Ryan's single consultative examination of Lumpkin. There is no indication that Dr. Ryan reviewed any of Lumpkin's medical records, and his report states that "[t]he patient is the historian for this exam . . . ." (Doc. # 18-11, at 69). His report also indicates that on the day of the exam, "the patient was having a good day . . ." (*Id.* at 71). At best, Dr. Ryan's examination "only gives a glimpse of [Lumpkin] on a single day." *Tankisi*, 521 F. App'x at 34.

## B.  The Claimant's Credibility

The plaintiff next argues that the ALJ applied the wrong legal standard and made insufficient findings in determining Lumpkin's credibility. The defendant counters with the

argument that the ALJ properly assessed the credibility of Lumpkin's subjective complaints.

In determining a claimant's RFC, an ALJ "is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citations omitted). In determining the credibility of a claimant's statements, the ALJ "must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." SSR 96-7p, 1996 WL 374186, at *1. It is the function of the Commissioner, not the Court, "to appraise the credibility of witnesses, including the claimant." *Campbell v. Astrue*, 465 F. App'x 4, 7 (2d Cir. 2012) (internal quotation marks omitted).

The plaintiff's claim that the ALJ applied the wrong legal standard in determining Lumpkin's credibility is based on the following statement contained in the ALJ's decision: "[T]he claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Doc. # 18-2, at 21). According to the plaintiff, this statement demonstrates that the ALJ erroneously evaluated the credibility of Lumpkin's testimony in light of its consistency with the RFC determined by the ALJ, rather than in light of the evidence in the record. The statement at issue appears to be boilerplate language routinely utilized in ALJ decisions. *See Bjornson v. Astrue*, 671 F.3d 640, 644-45 (7th Cir. 2012) (describing the quoted language as a "template," i.e.,

"a passage drafted by the Social Security Administration for insertion into any administrative law judge's opinion to which it pertains").  The phrasing of this boilerplate language is, at best, confusing, and if the decision did not further address the basis for the ALJ's determination regarding Lumpkin's credibility, the Court would be inclined to agree with the plaintiff.

Following the boilerplate language quoted above is a discussion about Lumpkin's post-surgery activities, including both his Activities of Daily Living and his employment, in light of his testimony regarding the functional limitations resulting from his symptoms. The ALJ found an "inconsistency between the claimant's activities and his allegations regarding the functional limitations of his impairment . . . ." (Doc. # 18-2, at 21). For example, Lumpkin had "indicated that he worked only temporary jobs of two days and four weeks, but later indicated that one of the jobs lasted for six months." (*Id.*).  Similarly, the ALJ noted that "[l]ater in the hearing, the claimant attempted to minimize his work by saying that he did not work with the steel or climb. However, he initially testified that he had 'dropped things from up there.'" (*Id.*). On the basis of this inconsistency the ALJ "[did] not find the claimant's testimony regarding the degree of limitation imposed by his impairment to be fully credible and consequently [gave] the claimant's testimony limited weight." (*Id.*).

An ALJ's decision "'must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *Tornatore v. Barnhart*, No. 05 Civ. 6858 (GEL), 2006 U.S. Dist. LEXIS 90397, at *19 (S.D.N.Y. Dec. 12, 2006) (quoting SSR 96-7p, 1996 WL 374186, at *4). "One strong indication of the credibility of an individual's statements is their

consistency, both internally and with other information in the case record." SSR 96-7p, 1996 WL 374186, at *5.  The Court concludes that the ALJ satisfied this standard with regard to his assessment of Lumpkin's credibility.

### C. Reliance on the Medical-Vocational Guidelines

The plaintiff's third argument is that the ALJ erred by relying on the Social Security Administration's Medical-Vocational Guidelines (the "Grids"), instead of requiring testimony from a vocational expert, in order to determine whether there was work in the national economy that Lumpkin could perform. The Grids "take[] into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience . . . [and] indicate whether the claimant can engage in any substantial gainful work existing in the national economy." *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999) (internal quotation marks and citation omitted). "For a claimant whose characteristics match the criteria of a particular grid rule, the rule directs a conclusion as to whether he is disabled." *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996). Here the ALJ found that a finding of "not disabled" was directed by the Grids. (Doc. # 18-2, 23).

"The Grids are inapplicable in cases where the claimant exhibits a significant non-exertional impairment[9] (i.e., an impairment not related to strength). . . . [T]he ALJ cannot rely on the Grids if a non-exertional impairment has any more than a negligible impact on a claimant's ability to perform the full range of work, and instead must obtain the testimony of a vocational

---

[9]Examples of non-exertional limitations include "difficulty tolerating some physical feature(s) of certain work settings, e.g., you cannot tolerate dust or fumes; or [] you have difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching." 20 C.F.R. § 404.1569a (c).

expert." *Selian*, 708 F.3d at 421 (internal quotation marks and citation omitted). As previously indicated, Dr. Johnson stated in his Questionnaire that Lumpkin has "significant limitations in doing repetitive reaching, handling, fingering or lifting," including being "essentially precluded" from using his right arm for reaching. (Doc. # 18-12, at 5,6). He also noted psychological limitations and the need to avoid fumes, gases, temperature extremes, dust, bending, and stooping as "other limitations that would affect [Lumpkin's] ability to work at a regular job on a sustained basis." (*Id.* at 8). Dr.Golkar's report noted certain postural limitations, i.e., no climbing ladders, ropes or scaffolds, and only occasional balancing, stooping, kneeling, crouching, crawling, or climbing ramps or stairs. Dr. Golkar also identified environmental limitations, i.e., avoid concentrated exposure to extreme cold or heat, and avoid even modest exposure to "hazards (machinery, heights, etc.)." (Doc. # 18-3, at 9).

The Court has previously discussed its concerns regarding the ALJ's rejection of the opinions of Lumpkin's treating physicians regarding his physical limitations. These concerns apply with equal force to the question of whether Lumpkin exhibited a significant non-exertional limitation and will need to be addressed by the ALJ on remand. With regard to the postural limitations noted in Dr. Golkar's report, the ALJ simply stated, after indicating that he afforded "great weight" to Dr. Golkar's opinion, that "[n]evertheless, the medical evidence of record does not support additional postural limitations." (Doc. # 18-2, at 22). There is no further indication as to what medical evidence of record was relied upon in support of that conclusion. Under these circumstances the Court cannot find that the ALJ had substantial evidence to support his conclusion that "[t]here is no indication in the medical evidence of record that would further restrict or limit the claimant from performing work-related activities" and then rely upon the

Grids to determine that Lumpkin is not disabled. (*Id.*).

CONCLUSION

For the reasons stated above, defendant's motion to affirm the Commissioner's decision (**doc. # 17**) is **DENIED**. Plaintiff's motion for judgment on the pleadings (**doc. # 13**) is **GRANTED IN PART**, to the extent it seeks a remand to the Commissioner, and **DENIED IN PART**, to the extent it seeks an immediate award of benefits. *See Martinez v. Colvin*, No. 12-CV-05713 (LGS) (RLE), 2014 U.S. Dist. LEXIS 89096, at *29  (S.D.N.Y. June 27, 2014) (internal quotation marks omitted) ("A court should order payment of benefits only where the record contains persuasive proof of disability and remand for further evidentiary proceedings would serve no further purpose.").

The decision of the Commissioner is reversed and the case is remanded to the ALJ for further proceedings consistent with this ruling. These proceedings shall include further development of the administrative record to the extent necessary for a consideration of the opinions of the treating physicians consistent with the treating physician rule and a determination of whether the claimant exhibits a significant non-exertional impairment.

**SO ORDERED** this     13th      day of August, 2014.


_____/s/ DJS_____
DOMINIC J. SQUATRITO
UNITED STATES DISTRICT JUDGE

-22-